IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| CONSERVATION LAW FOUNDATION, INC., <br>     Plaintiff, <br><br> v. <br><br> PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, <br>     Defendant. | ) <br> ) <br> ) <br> ) <br> )    **Case No.** <br> )    **11-cv-353-JL** <br> ) <br> ) <br> ) <br> ) <br> ) |

**DEFENDANT PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE'S REPLY
TO PLAINTIFF'S OBJECTION TO PSNH'S
MOTION TO DISMISS COUNTS ONE THROUGH FOUR**

Defendant Public Service Company of New Hampshire ("PSNH") submits this reply to Plaintiff Conservation Law Foundation's ("CLF") Objection to PSNH's Motion to Dismiss Counts One through Four pursuant to Rule 12(b)(6):

**ARGUMENT**

CLF ignores the central flaw in Counts One through Four of its Complaint: they are premature. The Clean Air Act and the New Hampshire rules are clear: a permit is only required for changes <u>that result in an increase in emissions</u>. *See* 42 U.S.C. § 7411(a)(4); 40 C.F.R. § 52.21(b)(2)(i); N.H. Admin. Rules Env-A 101.57. No increase in emissions was projected to result from PSNH's turbine project. Thus, the New Hampshire Department of Environmental Services ("DES") determined that no air permit was required—conditioned only on PSNH submitting five years of post-project annual emissions data to confirm PSNH's expectation that emissions would not increase. *See* Compl., Ex. A-13. Unless and until this ongoing, post-construction monitoring shows an increase in emissions, no increase can be reasonably alleged,

and no legal action may be pursued. Any other conclusion leaves this Court to second-guess DES's determination while that determination is still conditional.

CLF takes extreme umbrage with PSNH's position that the New Hampshire rules automatically incorporated the Clean Air Act regulations known as the "2002 NSR Rules." As discussed below, these provisions were, indeed, incorporated and in effect at the relevant times. But even if they were **not** automatically incorporated, CLF's claims about the turbine replacement project would still be premature and subject to summary dismissal. This is because the 1992 rules (which CLF argues do apply) also allow utilities to submit post-project emissions data to the regulator to confirm the reasonableness of the pre-project projection of no emissions increase. And when utilities do so, they cannot be sued unless and until the post-project data demonstrates an increase from the project.

I.   CLF's Claims Are Premature Under Both The 1992 "WEPCo" Rules And The 2002 NSR Rules.

   A.   The PSD Program Requires PSNH To Conduct Pre-Construction Review.

The PSD program obligates regulated parties, *prior to beginning construction*, to determine whether or not proposed work triggers PSD permitting. 57 Fed. Reg. 32314, 32316–17 (July 21, 1992); *See* Doc. 15-1, at 5-9 (summarizing the PSD program). If a project would constitute a "major modification," then the owner must get a PSD permit before construction begins unless an exclusion applies.[1] Naturally, the corollary is true—if a project is not a "major modification," then construction may proceed without a PSD permit. Yet, CLF behaves as if a

---

[1] The PSD rules contain a number of exclusions. For example, "major modification" does not include, among other things: (1) routine maintenance, repair and replacement projects, (2) an increase in the production rate, (3) an increase in the hours of operation, and (4) use of an alternative fuel. 40 C.F.R. § 52.21(b)(2)(iii).

pre-construction determination that <u>no permit is required</u> somehow undermines the pre-construction character of the program. This is wrong.[2]

The PSD program places the pre-construction burden of determining whether a project triggers PSD permitting on the regulated party. 57 Fed. Reg. at 32,321 (stating that "sources remain responsible in the first instance for determining what permitting requirements apply to their activities."). For projects not otherwise excluded, the only way to make this determination is to estimate ahead of time whether a project will cause an increase in annual emissions. Here, PSNH performed specific calculations that showed no increase in emissions would result. *See* Compl., Ex. A-7. DES reviewed this data and conditionally agreed that no permitting obligation was triggered. *See* Compl., Exs. A-4 at 11–15, A-7; *see also* 2011 DES Full Compliance Evaluation (hereinafter referred to and attached as Ex. A). PSNH subsequently submitted post-project emissions data to DES, <u>which has analyzed the data and determined that, as projected, the turbine project has not caused any emissions increase.</u>[3]

CLF simply ignores all of this and attempts to engage this Court in a hypothetical debate over PSNH's original projection of no future emissions increase resulting from the turbine project. Repeatedly, CLF attempts to justify this second-guessing on the misguided notion that

---

[2] It is disingenuous for CLF to claim, having attached to its own Complaint evidence of PSNH's compliance with New Hampshire's pre-construction PSD program, and having already litigated the very issue in other state forums (and losing in each forum), that PSNH has "utterly disregarded the preconstruction permitting framework." CLF Objection at 2; *see also* Compl., Exs. A-4 at 11–15, A-3, A-7, A-11, A-13; ARC Order of Oct. 29, 2009, Docket No. 09-11, at 4.

[3] On October 18, 2011, DES notified PSNH that DES had completed a "Full Compliance Evaluation" of Merrimack Station including review of actual emissions data from MK2 following replacement of the turbine in 2008. Ex. A. DES compared the actual post-project emissions data to the actual pre-project emissions baseline, and confirmed that NOx "emissions have not exceeded the pre-change actual emissions baseline" and that PM and SO2 "emissions have not increased due to the unit MK2 changes made in 2008." *See id.* at 15–18. This analysis led DES to conclude that "PSNH-Merrimack is in compliance" with the very regulations CLF claims have been violated. *Id.* at 17.

3

because the PSD program is a pre-construction program "regulatory review in a public process [must occur] *before any changes are made*." CLF Objection at 2. But the PSD permitting process requires no regulatory review in a public process when emissions are not projected to increase or projects are excluded from review.

    **B.**    **Both the 1992 and 2002 NSR Rules Allow PSNH To Confirm Its Pre-Construction Emissions With Post-Construction Reporting, Without Being Subject To CLF's Second Guessing.**

In 1992, EPA revised the PSD rules to allow utilities to confirm pre-construction emissions projections by reporting post-construction emissions to the regulator. *See* 40 C.F.R. § 52.21(b)(21)(v) (2001). Commonly known as the "WEPCo Rule," EPA made clear that the post-project reporting process would relieve utilities from having their projections second-guessed:

> Several commenters opposing today's regulatory changes charged that without appropriate assurances utilities could deliberately underestimate future operations (and thus emissions) . . . . To guard against the possibility that significant increases in actual emissions attributable to the change may occur under this methodology, EPA is clarifying in the final regulations that any utility which utilizes the 'representative actual annual emissions' methodology to determine that it is not subject to NSR must submit for 5 years after the change sufficient records <u>to determine if the change results in</u> an increase in representative actual annual emissions.

57 Fed. Reg. at 32,325 (emphasis added). EPA further explained that

> NSR applies only where the emissions increase <u>is caused</u> by the change. Thus the issue should be viewed more as one of tracking . . . emissions levels at the unit to confirm that baseline emission levels are not exceeded as a result of the change. . . . [T]he intent is to confirm the utility's initial projections rather than annually revisiting the issue of NSR applicability. If, however, the reviewing authority determines that the source's emissions have in fact increased significantly over baseline levels as a result of the change, the source would become subject to NSR requirements <u>at that time</u>.

*Id.* (emphasis added). Ten years later, EPA amended the rules again with the "2002 NSR Rules." The 2002 revisions (i) expanded the reach of the 1992 PSD Rules, which had been limited to electric utilities, to all industries; and (ii) clarified how to calculate emissions increases. *See* 67

4

Fed. Reg. 80,186, 80,196 (Dec. 31, 2002). EPA explained that with regard to utilities, the 2002 NSR Rules "represent a sensible refinement of the rules we promulgated in 1992." *Id.* at 80,192.

### C. The 2002 NSR Rules Were Part of the New Hampshire SIP at the Time PSNH Submitted its Pre-Construction Projections.

During the period from June 2006 (when PSNH first notified DES of the planned turbine project) and April 2008 (when PSNH began construction), New Hampshire's rules incorporated by reference the federal PSD rules found at 40 C.F.R. §52.21, without any date reference. N.H. Admin. Rules Env-A 619.03. And during that period, 40 C.F.R. §52.21 unquestionably contained the 2002 NSR Rules. The plain reading of New Hampshire's regulation, therefore, is to incorporate the then-existing version of 40 C.F.R. § 52.21. As EPA noted in the Federal Register when it approved New Hampshire's rules, "New Hampshire's . . . PSD rule did not define a date of the incorporated rule revision of 40 CFR 52.21. Without this date, New Hampshire believes its PSD rules will automatically incorporate and implement all future revisions to 40 CFR 52.21 without the need for additional state rulemaking." 67 Fed. Reg. 65,710, 65,711 (Oct. 28, 2002).

CLF does not dispute the DES Commissioner's authority to incorporate the CFR by reference. In fact, the Commissioner is obligated to adopt rules that ensure air quality is maintained in conformance with the "Clean Air Act as amended." RSA 125-C: 4, I(d); RSA-C: 6, XIV-a–XVI (emphasis added). Given the express obligation to promulgate air permitting regulations in conformance with the "Clean Air Act as amended," and the evolving federal law regulating air emissions, the Commissioner may certainly prefer to adopt regulations that automatically keep up with subsequent changes in federal law. Indeed, the same section of the New Hampshire statute incorporates 40 CFR part 279 without referencing an edition date. *See* RSA 125-C: 6, VI-a.

5

CLF claims that despite (i) the plain wording of the New Hampshire rule, (ii) EPA's pronouncement in the Federal Register, and (iii) the highly correlated relationship between state and federal rules, that this Court must freeze the reference to the CFR in time—even without a date. CLF bases its argument on two sources. First, CLF points to the New Hampshire "manual" for drafting administrative rules. Even if the manual's instruction to include an edition date for referenced material applied here (which is far from clear),[4] it was not followed. The manual cannot re-write the text of the rule that actually was adopted. Indeed, once the rule was adopted, State law is clear that the manual has no further role: "[t]he director may require any agency to rewrite any rule submitted for filing to conform to this manual <u>until that rule is adopted and filed</u> . . . ." RSA 541-A:8 (emphasis added). Thus, even to the extent the manual could "prohibit" automatic updating, as CLF would have it, the remedy for such drafting is for the director of legislative services to require the Commissioner to rewrite the rule <u>before it is adopted and filed</u>. *Id.* That time has long passed. Second, CLF relies on an unpublished 2003 letter from DES to EPA Region I, addressing confusion caused by DES's decision to incorporate the CFR in an undated form. But DES cannot revise its rules through a piece of unpublished correspondence. *See, e.g., United States v. Hoyts Cinemas Corp.*, 380 F.3d 558, 569 (1st Cir. 2004) ("[W]here, as here, the interpretation has the practical effect of altering the regulation, a formal amendment—almost certainly prospective and after notice and comment—is the proper course."). DES's letter does not change the plain reading of the rule.

---

[4] It is not at all clear that the manual provision relied upon by CLF applies to incorporations of the Code of Federal Regulations, such as the one at issue here, because such incorporations are specifically excluded from any requirement to file an "Incorporation by Reference Statement." CLF Ex. 1, Manual p. 87.

### D. CLF's Claims Are Premature Because PSNH Complied With Both the 2002 and 1992 Rules.

Even if this Court concludes it is unclear whether the 2002 NSR Rules were automatically incorporated,[5] the Court should still grant PSNH's motion to dismiss. This is because, before beginning construction, PSNH projected emissions and made baseline emissions calculations and DES approved the pre-construction determination that emissions would not increase, on the sole condition that PSNH report post-construction emissions data to confirm the pre-construction analysis. Compl., Ex. A-13. PSNH has since reported post-construction emissions data that "confirms . . . emissions have not increased due to the unit MK2 changes . . . ." Ex. A at 17. This approach insulates PSNH (and DES) from CLF's post hoc second-guessing of PSNH's pre-project projection under either the 2002 NSR Rules or the prior 1992 "WEPCo" Rule. As DES stated with regard to this very project, "[t]he WEPCO rule allows a source . . . to lawfully avoid the NSR permitting process if it can demonstrate that the post-change actual emissions do not increase . . . ." Compl., Ex. A-4 at 11.

Dismissal based on either the 1992 WEPCo Rule or the 2002 NSR Rules also is consistent with the holding in *United States v. DTE Energy Company*, No. 10-13101, 2011 U.S. Dist. LEXIS 95175 (S.D. Mich. Aug. 23, 2011) (on appeal to 6th Circuit), where the district court dismissed as premature the United States' claims challenging projects undergoing the state environmental agency's review.[6] In *DTE*, the court addressed pre-project projections and post-

---

[5] In the Government's amicus brief, they, like EPA, "assume that PSNH is correct that the New Hampshire State Implementation Plan ('SIP') has adopted the 2002 Rules promulgated by EPA" while recognizing whether this is correct involves a "mixed question of fact and law involving the nature of the SIP." Gov't Br. at 1–2 n.1.

[6] Dismissal also is consistent with the Air Resources Council's ("ARC") finding that it lacked jurisdiction to overturn DES's non-final, conditional approval of the turbine project: "[u]ntil such time has passed, such review has been completed, and a decision on whether new source review is necessary is made, DES's action is not final." ARC Order of Oct. 29, 2009, at

7

project reporting submitted under the 2002 rules.  But the reasoning in that decision applies to the provisions of the 1992 rules as well.  As the *DTE* opinion explains:

> Once the source operator submits [emissions] projections, it need not obtain an NSR permit before beginning construction. . . . [I]f the post-project data show an emissions increase resulting from the project, <u>then</u> the project is considered to have been a major modification . . . ."

*Id.* at *8 (emphasis added).  To support its explanation of the 2002 NSR Rules, the *DTE* opinion quotes from the preamble <u>of the prior 1992 WEPCo Rule</u>:

> As the EPA has explained, post project monitoring 'provide[s] a reasonable means of determining whether a significant increase . . . resulting from a proposed change . . . occurs within 5 years following the change.'  57 Fed. Reg. At 32,325.  If the [State] 'determines that the source's emissions have in fact increased significantly over baseline levels as a result of the change, the course would become subject to NSR requirements <u>at that time</u>,'. . . .

*Id.* at *8–9 (emphasis added).

Both CLF and *amicus* refer this Court to cases decided in Ohio and Indiana for the proposition that post-construction data are irrelevant to the analysis.  CLF Objection at 20 n.21.  But these cases do not say what CLF or the Government suggest.  None of these decisions involved situations like this one where a utility had performed pre-construction emissions analyses, provided its pre-project emissions calculations to the permitting authority, received explicit approval from the regulator to move forward without PSD permitting, and, in accordance with regulatory direction, provided post-project emissions data to the authorities.  Rather, in the cases relied upon by CLF and the Government, the courts were addressing whether they should *substitute* post-construction data for pre-project emissions projections that were never done.

---

4. CLF misses the point when it argues that the ARC never reached a decision on the merits.  It is the ARC's jurisdictional finding that is relevant here.  CLF's challenge was premature before ARC and is premature here.  *See Baris v. Sulpicio Lines, Inc.*, 74 F.3d 567, 571 (5th Cir. 1996) (holding that dismissal for a lack of jurisdiction does not operate as an adjudication on the merits, but does preclude relitigating the specific issue of jurisdiction).

8

Here, as in *DTE*, actual emissions data is being used under the applicable rules to "confirm" PSNH's pre-construction projections. This is clearly different from the situation in *Ohio Edison*, where the court explained:

> NSR/PSD regulations require <u>a pre-construction evaluation</u> of whether the change 'would result in a significant net emissions increase of any pollutant subject to regulation under the Act.' [The utility] failed to offer any independent <u>calculation of emissions</u>; rather, [its] testimony consists of an attempt to discredit the calculations obtained by the Government's expert, . . . . Defendant's obligation under the statute [is] to project future emissions *prior* to an activity being undertaken.

*United States v. Ohio Edison Co.*, 276 F. Supp. 2d 829, 863, 878, 881 (S.D. Ohio 2003) (underline added) (citation omitted). This holding is consistent with the DTE decision, with DES's position, and with PSNH's actions. Once a *pre-construction evaluation*, including a *calculation of emissions*, was performed *prior to an activity being undertaken*, PSNH had satisfied its obligation pending submission of confirming data. *See id.* PSNH provided (and continues to provide) the post-project data it was required to submit. DES has now confirmed that data establishes the correctness of PSNH's pre-construction analysis that no emissions increase would result from the turbine project. *See* Ex. A at 15. Neither the 2002 Rules nor the 1992 WEPCo Rule permit the second-guessing CLF urges upon this Court.[7]

## II.    CLF's Aggregation of Admittedly Unrelated Projects in Counts One Through Four For Purposes of Discovery Is Improper.

CLF's claims concerning the so-called "additional modifications" in Counts One through Four fail to satisfy its Rule 8(a)(2) requirement of "a short and plain statement of the claim showing that the pleader is entitled to relief," and fail to state a plausible claim under Rule

---

[7] PSNH's pre-construction determination that no emissions would increase renders Plaintiff's "minor NSR" claims premature as well. Because temporary permits are only required for activities that result in an emissions increase, and PSNH did not project increases in any air pollutants, PSNH was under no obligation to acquire a temporary permit. *See* N.H. Rules Admin. Env-A 101.57 (1990).

12(b)(6). CLF says it is claiming that two "distinct *set[s]* of related changes [were] subject to preconstruction permit requirements under the N.H. Regulations because each set results in increased emissions due to the changes." CLF Objection, at 22. But CLF admits that it "is *not* claiming, . . . that every individual change referenced in the Complaint, standing alone, results in a significant increase in Unit 2's emissions." *Id.* at n.22 (emphasis in original). CLF's Counts One through Four fail to give PSNH fair notice of what work CLF maintains resulted in a significant net emissions increase. *See* 40 C.F.R. § 52.21(b)(2). Indeed, CLF does not appear to know itself, since it goes on to state that "[u]ltimately, the precise relationships of the individual changes to each other and to the overall emissions increases are factual issues to be addressed through discovery." CLF Objection, at 22 n.22. PSNH should not have to resort to discovery to find out which projects CLF claims did and did not cause emissions increases.

As discussed in PSNH's principal brief, the "additional modifications" described by CLF are unrelated routine maintenance tasks performed on a regular basis by utilities and for both efficiency and safety reasons are scheduled to be performed concurrently during planned maintenance outages. To characterize this unrelated routine work as a "set" is conclusory and not plausible, and demonstrates a lack of understanding of both the nature of the activities and of the electric utility industry itself. Counts One through Four should be dismissed because they fail to state a plausible claim or provide notice to PSNH as to what work CLF maintains is unlawful. *See Harron v. Town of Franklin*, No. 10-1800, 2011 U.S. App. LEXIS 22029, at *12 (1st Cir. Oct. 31, 2011) (*aff'g* Rule 12(b)(6) dismissal where allegations were woefully deficient and failed to give fair notice to defendant and state a facially plausible claim).

|  |  |
|---|---|
|  | Respectfully submitted, |
|  | PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE<br>By its attorneys, |
|  | McLANE, GRAF, RAULERSON & MIDDLETON,<br>    PROFESSIONAL ASSOCIATION |
| Date: December 2, 2011 | By:     /s/ Wilbur A. Glahn, III<br>Wilbur A. Glahn, III, NH Bar No. 937<br>bill.glahn@mclane.com<br>Barry Needleman, NH Bar No. 9446<br>barry.needleman@mclane.com<br>900 Elm Street, P.O. Box 326<br>Manchester, New Hampshire 03105<br>Telephone (603) 625-6464 |
| Linda T. Landis, Bar No. 10557<br>landilt@nu.com<br>Senior Counsel<br>Public Service Company of New Hampshire<br>780 No. Commercial Street<br>Manchester, NH 03101<br>Telephone (603) 634-2700 | Michael D. Freeman (admitted *pro hac vice*)<br>mfreeman@balch.com<br>Spencer M. Taylor (admitted *pro hac vice*)<br>staylor@balch.com<br>BALCH & BINGHAM LLP<br>Post Office Box 306<br>Birmingham, AL 35201-0306<br>Telephone: (205) 251-8100 |

**Certificate of Service**

I hereby certify that on December 2, 2011, I served the foregoing document electronically through ECF upon the following counsel of record:  Christophe G. Courchesne, Esq., Melissa A. Hoffer, Esq., N. Jonathan Peress, Esq.; and Elias L. Quinn, Esq.

            /s/ Wilbur A. Glahn, III
            Wilbur A. Glahn, III

11