UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE

Conservation Law Foundation

    v.                          Civil No. 11-cv-353-JL
                                       Opinion No. 2012 DNH 174

Public Service Company of New Hampshire

**MEMORANDUM ORDER**

This is a citizen suit brought by the Conservation Law Foundation ("CLF"), which alleges that Public Service Company of New Hampshire ("PSNH") has violated the Clean Air Act ("CAA"), 42 U.S.C. § 7401 et seq., by operating Merrimack Station, a coal-fired power plant, without (or in violation of) required permits. Specifically, CLF alleges in Counts 1 through 4 of its complaint that PSNH failed to obtain permits prior to making changes to the plant in 2008 and 2009. These changes, it claims, have resulted and will continue to result in increased pollutant emissions. In Counts 5 and 6, CLF alleges that PSNH failed to obtain permits prior to installing and operating sorbent and activated carbon injection equipment at the plant, and in Count 7, CLF alleges that PSNH operated electrostatic precipitators at the plant in contravention of its temporary permits. CLF seeks a declaratory judgment that PSNH has violated the CAA, an award of civil penalties payable to the United States Treasury, and various injunctive relief.

PSNH has moved to dismiss the entire action pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, arguing that CLF has not alleged sufficient facts to demonstrate that it has Article III standing to bring this suit.[1]  See U.S. Const. art. III, § 2, cl. 1.  PSNH argues that CLF's complaint fails to allege that any of its members suffered any injury as a result of PSNH's alleged CAA violations, as is required to establish standing.  PSNH further asserts that Counts 5 through 7 of CLF's complaint allege "wholly past violations," and that there is "no possibility of an imminent future violation," such that CLF is unable to establish the redressability requirement of Article III standing as to those claims.

After hearing oral argument, this court denies the motion as to Counts 1 through 4 and grants the motion as to Counts 5 through 7.  CLF's allegations, which are supplemented by affidavits and other supporting documents, are sufficient (at least at this stage of the case) to demonstrate that its members suffered a cognizable injury from the CAA violations alleged in Counts 1 through 4, and that the alleged injury is redressable

---

[1]PSNH also filed a separate motion to dismiss Counts 1-4 (but not Counts 5-7) for failure to state a claim.  See Fed. R. Civ. P. 12(b)(6).  Because the questions presented by that motion are also at issue in a case pending before the Court of Appeals for the Sixth Circuit, see United States v. DTE Energy et al., No. 11-2328 (6th Cir. Oct. 25, 2011), this court will refrain from ruling on PSNH's Rule 12(b)(6) motion until that court renders its decision.  See Order of Sept. 4, 2012.

through the claims brought here.  CLF has not shown, however,
that it suffered any injury traceable to the violations alleged
in Count 7, or that this court can redress the injuries alleged
in Counts 5, 6, or 7.  Those claims are accordingly dismissed.

## I.  __Applicable legal standard__

In considering a motion to dismiss for lack of standing
under Rule 12(b)(1), the court "accept[s] as true all well-
pleaded factual averments in the plaintiff's complaint and
indulge[s] all reasonable inferences therefrom in his favor."
Katz v. Pershing, LLC, 672 F.3d 64, 70 (1st Cir. 2012) (internal
quotation marks omitted).  The court may also consider material
outside the pleadings, such as affidavits, to aid in its
determination.  Gonzalez v. United States, 284 F.3d 281, 287-88
(1st Cir. 2002).  "[A] suit will not be dismissed for lack of
standing if there are sufficient allegations of fact . . . in the
complaint or supporting affidavits."  Gwaltney of Smithfield,
Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 65 (1987)
(internal quotations omitted).

The parties dispute the level of specificity required of
those allegations.  PSNH, relying on United States v. AVX Corp.,
962 F.2d 108 (1st Cir. 1992), argues that the facts establishing
CLF's standing must be set forth with "heightened specificity."
CLF, on the other hand, argues that the standard articulated in

AVX applies, at most, to intervenors in appellate cases, and that
more generally applicable rules of pleading also apply to factual
allegations regarding a plaintiff's standing to sue in the
district court.  Both parties are, to some degree, correct.

In AVX, the National Wildlife Federation, an intervenor in
the case below, sought to appeal a consent decree entered in the
district court.  Id. at 110.  The Court of Appeals, surveying
"various classes of cases in which we have required a heightened
degree of specificity to withstand a motion to dismiss,"
concluded that "[b]ecause standing is fundamental to the ability
to maintain a suit, . . . where standing is at issue, heightened
specificity is obligatory at the pleading stage."  Id. at 115.
As articulated by the Court of Appeals, this burden "cannot be
satisfied by purely conclusory allegations or by a Micawberish
reading of a party's generalized averments."  Id.  Instead, the
complainant "must set forth reasonably definite factual
allegations, either direct or inferential, regarding each
material element needed to sustain standing."  Id.  In other
words, "the facts necessary to support standing must clearly
appear in the record and cannot be inferred argumentatively from
averments in the pleadings."  Id. (internal quotations omitted).

In this court's view, AVX's description of this standard as
one of "heightened specificity" merely reflects the pleading
paradigm in 1992, the year that case was decided.  At that time,

it had been accepted for over 30 years that under Rule 8 of the
Federal Rules of Civil Procedure, a complaint was facially
deficient only if "it appears beyond doubt that the plaintiff can
prove no set of facts in support of his claim which would entitle
him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). As
the Supreme Court later explained, some lower federal courts read
this statement in isolation to say that, unless the "factual
impossibility" of plaintiff's recovery was evident on the face of
the complaint itself, the pleading would suffice under Rule 8.
Bell Atl. Corp. v. Twombly, 550 U.S. 544, 561 (2007). Under this
reading, "a wholly conclusory statement of claim would survive a
motion to dismiss whenever the pleadings left open the
possibility that a plaintiff might later establish some set of
undisclosed facts to support recovery."[2] Id. (internal
quotations and alterations omitted). Thus, some courts had held
that, so long as one could "imagine facts consistent with [the]
complaint and affidavits that [would] show plaintiffs' standing,"
the complaint would pass muster. Alliant Energy Corp. v. Bie,
277 F.3d 916, 920 (7th Cir. 2002) (emphasis omitted; citing
cases); see also, e.g., Ed Miniat, Inc. v. Globe Life Ins. Group,

---

[2]The Court also noted that "this approach to pleading would
dispense with any showing of a reasonably founded hope that a
plaintiff would be able to make a case," and, echoing AVX, wryly
commented that "Mr. Micawber's optimism would be enough."
Twombly, 550 U.S. at 562 (internal quotations and citations
omitted).

Inc., 805 F.2d 732, 735-36 (7th Cir. 1986); Dudley v. Se. Factor & Fin. Corp., 446 F.2d 303, 308-09 (5th Cir. 1971).

It was against that backdrop that AVX was decided.  Taken in context, AVX's rejection of "conclusory allegations" and "generalized averments" in favor of "factual allegations, either direct or inferential, regarding each material element needed to sustain standing," 962 F.2d at 115, might well have been characterized as a "heightened" standard.  In today's post-Twombly pleading paradigm, though, that standard is the rule, not the exception.  Twombly makes clear that "conclusory allegations" are insufficient, and it is not enough that the complaint's allegations are "merely consistent with" the plaintiff's ability to recover.  Twombly, 550 U.S. at 557.  "Threadbare recitals of the elements of a cause of action" (or, as is the case here, the elements of standing) similarly "do not suffice."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).  Instead, the complaint must contain some "factual content that allows the court to draw the reasonable inference" that the plaintiff may recover.  Id.

The Supreme Court's proclamations in Twombly and Iqbal do not differ materially from the Court of Appeals' holding in AVX.  Insofar as PSNH argues that this court must apply the standard articulated in that case, then, it is correct, and CLF is equally correct that this court must apply generally applicable pleading standards.  To the extent that PSNH argues that AVX requires more

6

specific allegations than the Rule 8 standard articulated in
Twombly and Iqbal, though, it is incorrect.  And, to the extent
that CLF suggests it should be held to a lesser standard than
that set forth in AVX, Twombly, and Iqbal, it is also incorrect.

## II.  **Background**

PSNH operates plants that generate electricity in several
locations in New Hampshire; these include Merrimack Station in
Bow.  Merrimack Station, which consists of two units dubbed "MK1"
(in operation since 1960) and "MK2" (in operation since 1968),
generates power by burning coal.  In addition to generating
power, this process emits pollutants, including nitrogen oxide
($NO_x$), sulfur dioxide ($SO_2$), and particulates, into the air.  $NO_x$
and $SO_2$ emissions have significant adverse effects on public
health.  These emissions also contribute to the formation of
secondary particulate matter that may cause decreased lung
function, worsened respiratory infections, heart attacks, and the
risk of early death.

CLF is a nonprofit organization, with more than 300 members
in New Hampshire, that works to reduce emissions from coal-
burning power plants.  CLF alleges that its members are exposed
to pollution from Merrimack Station, and that they suffer from,
and are at increased risk of, a variety of adverse health effects
attributable to this exposure.  CLF has submitted the affidvits

of two of its members, who live in the immediate vicinity of
Merrimack Station and express "concern" about the health effects
of its emissions of pollutants.

As part of the CAA regulatory scheme, the Environmental
Protection Agency has established National Ambient Air Quality
Standards ("NAAQS") that it has deemed "requisite to protect the
public health" and "the public welfare." 42 U.S.C. § 7409(b);
see 40 C.F.R. § 50.1 et seq.  The CAA requires each state,
including New Hampshire, to implement and enforce these standards
through a "state implementation plan," or "SIP", which must
include a plan for "New Source Review" ("NSR"), i.e., for
regulating the construction of and major modifications to air
pollution sources within the state.  See generally 42 U.S.C. §§
7410-7411.  For areas that have not achieved NAAQS, states are
required to have a "Non-Attainment NSR" ("NA-NSR") plan.  See
generally id. §§ 7501-7515.  Merrimack County, in which Merrimack
Station is located, has been designated a non-attainment area for
ozone.  See 40 C.F.R. § 81.330.  To diminish emissions, the CAA
also established the "Prevention of Significant Deterioration,"
or "PSD" program.  See generally 42 U.S.C. §§ 7470-7492.

Under both the NA-NSR and PSD programs, covered facilities
are subject to emissions standards.  Among other things, the PSD
program requires that certain facilities meet best available
control technology ("BACT") standards.  Id. § 7475(a)(3).  For

8

its part, the NA-NSR program requires that facilities in non-attainment areas comply with the lowest achievable emission rate ("LAER").  Id. § 7503(a)(2).  Merrimack Station, due to its age, has not yet been required to comply with those standards.  See United States v. Cinergy Corp., 458 F.3d 705, 709 (7th Cir. 2006) (explaining that the CAA "treats old plants more leniently than new ones because of the expense of retrofitting pollution-control equipment," in the "expectation that old plants will wear out and be replaced by new ones that will be subject to the more stringent pollution controls" for new plants).

CLF alleges that PSNH has repeatedly failed to comply with the permitting requirements of the CAA and New Hampshire's SIP, which has also enabled it to avoid its obligation to observe the BACT and LAER standards.  In April 2006, PSNH began a program to design, install, and operate an activated carbon and sorbent injection system ("ACI system") at Merrimack Station, the purpose of which was to reduce mercury emissions.  Work on the ACI system continued over the next several years; although this work was supported by the U.S. Department of Energy, PSNH did not obtain preconstruction, operating, and PSD permits for the ACI system. CLF alleges that on several occasions between January 2007 and April 2008, PSNH used the ACI system to inject magnesium oxide, trisodium hydrogendicarbonate dihydrate, and activated carbon into the emissions from the plant.  On each occasion, this

resulted in "increased opacity," meaning that the particulate emissions were visible to the naked eye.  PSNH discontinued the ACI system in 2009.

In 2008, PSNH replaced a steam turbine in MK2 and, at the same time, replaced or installed other equipment in MK2.  CLF alleges that, before those changes were made, PSNH projected that they would cause an increase in annual $NO_x$ emissions, but failed to obtain permits that, CLF contends, are required under the New Hampshire SIP and the CAA by virtue of the increased emissions. In 2009, PSNH shut down MK2 for several months to perform additional modifications to the turbine and the unit as a whole. CLF alleges once again that, although the 2009 modifications resulted in increased pollutant emissions, PSNH did not obtain the necessary permits.

CLF also alleges that PSNH operates electrostatic precipitators[3] on MK1 and MK2 under temporary permits issued by the New Hampshire Department of Environmental Services.  CLF contends that PSNH did not operate the precipitators as required by the permits on several occasions in 2008 and 2009, and that

---

[3]Electrostatic precipitators, or ESPs, reduce particulate emissions.  See Compl. ¶ 82.  "The basic process by which an ESP works to capture flyash from the flue gas is to remove particles from the gas exhaust stream by electrically charging the particles and then attracting them to collection plates having the opposite charge."  Sierra Club v. Tenn. Valley Auth., 592 F. Supp. 2d 1357, 1363 (N.D. Ala. 2009).

PSNH further failed to comply with the permits' recordkeeping and recording requirements.  PSNH represents that it now operates the electrostatic precipitators under a new and current permit, with which it is in compliance.  CLF does not dispute that representation.

**III.  <u>Analysis</u>**

Article III of the Constitution "limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'"  Lujan v. Defenders of Wildlife, 504 U.S. 555, 559 (1992) (quoting U.S. Const. art. III, § 2, cl. 1).  One facet of this case-or-controversy requirement is the doctrine of standing, which serves to ensure that the plaintiff "is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers."  Warth v. Seldin, 422 U.S. 490, 518 (1975).  "[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  Davis v. F.E.C., 554 U.S. 724, 734 (2008) (internal quotations omitted).  To meet this burden, the plaintiff must show that "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed

by a favorable decision." _Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,_ 528 U.S. 167, 180-81 (2000). "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." _Id._ at 181.

As noted, PSNH challenges CLF's standing to pursue all seven counts of its complaint.  PSNH does not dispute that the interests at stake here are germane to CLF's purpose and that the suit does not require the participation of any CLF's members.  It argues, however, that CLF has not sufficiently alleged that any of its members were injured by the alleged CAA violations such that they "have standing to sue in their own right." _Id._  PSNH also argues that CLF lacks standing as to Counts 5 through 7 because it cannot establish "that the injury will be redressed by a favorable decision." _Id._

The court denies PSNH's motion as to Counts 1 through 4, but grants it as to Counts 5 through 7.  As discussed in more detail below, CLF's allegations are sufficient, at least at this point in the case, to establish that its members have suffered injury, in the form of air pollution generated by PSNH's Merrimack Station, that is traceable to the CAA and SIP violations alleged

12

in Counts 1 through 6.  CLF has not, however, sufficiently shown
an injury to its members resulting from the violations alleged in
Count 7; nor has it shown that the injuries alleged in Counts 5
through 7 are redressable by this court.

### A.   *Counts 1 through 4*

Counts 1 through 4 arise out of PSNH's alleged failure to
obtain permits before making changes and repairs to MK2 in 2008
and 2009.  As already discussed, CLF alleges that before making
these changes, PSNH projected that the new turbine would cause an
increase in $NO_x$ emissions, but nonetheless failed to obtain the
required permits.  In response to PSNH's contention that CLF has
not alleged any injury to its members, CLF argues that it has
sufficiently alleged that this increase in emissions caused
physical harm to its members.  The court agrees that based upon
CLF's allegations and the present state of the record, Counts 1
through 4 withstand PSNH's motion--at least for now.

In its complaint, CLF alleges that the increased emissions
caused by PSNH's CAA violations "are degrading the quality of air
breathed by" CLF members.  Compl. ¶ 3.  Because they are "exposed
to, and threatened with exposure to, particles and other
pollution from Merrimack Station," CLF avers, its members "suffer
from, and are at increased risk of, a variety of adverse health
effects."  Id. ¶ 17.  CLF further alleges that its members "use

13

and enjoy New England and New England's natural resources for hiking, camping, fishing, sightseeing, and other recreational and aesthetic purposes," id. ¶ 16, and that Merrimack Station's emissions "interfere[] with their use and enjoyment of property and the surrounding areas, den[y] them protection of their health and well-being . . . , and negatively impact[] their aesthetic and recreational interests," id. ¶ 19.

PSNH, again citing AVX, argues that these allegations are too "general and conclusory" and "not anchored in any relevant particulars."  Memo. in Supp. of Mot. to Dismiss (document no. 14-1) at 12-13.  PSNH suggests that because CLF did not "identify any specific member who suffered injury, [and] his or her place of abode or their frequency of use," CLF has failed to clear the hurdle of showing injury to its members.  Id. at 13.  Assuming, dubitante, that PSNH is correct and that these omissions render the complaint's allegations "too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture," Katz, 672 F.3d at 73, CLF has successfully remedied that deficiency.

In response to PSNH's motion, CLF has supplemented the allegations of its complaint with the affidavits of two of its members.[4]  Elizabeth Kruse of Candia, New Hampshire, and Robert

_____

[4]As previously noted, this court may consider affidavits and other material outside the pleadings in determining whether the

14

Backus of Manchester, New Hampshire, who are presently CLF members (and were at the time of PSNH's alleged violations), both attest that they live within ten miles of Merrimack Station.[5] Both claim to be impacted by airborne pollutants emitted from the station and concerned about the health effects of their exposure to those pollutants.  Kruse states that she suffers from heart arrhythmia, which she understands can be exacerbated by exposure to air pollution.  To the extent that the complaint's allegations fail to meet AVX's pleading standard, these affidavits remove any doubt.  These are not the type of "nebulous allegations regarding [CLF's] members' identities and their connection to the relevant geographic area" which the AVX court decried.  962 F.2d at 117. To the contrary, CLF has "clearly identified" two of its members who "reside[] in a single, defined [geographic] area, directly affected by the challenged action."  Id.

PSNH, focusing on Kruse's and Backus's expressed concern about the health impacts of the station's emissions, argues that "generalized concerns" are insufficient to show an actual injury.

───────────────

plaintiff has standing to bring suit.  Gonzalez, 284 F.3d at 287-88; see also, e.g., Torres-Negrón v. J & N Records, LLC, 504 F.3d 151, 163 (1st Cir. 2007).

[5]Timothy Harwood, CLF's Vice President for Development, has also submitted an affidavit attesting to his understanding that 39 CLF members live within 20 kilometers of Merrimack Station, and an additional 93 CLF members live within 50 kilometers of the station.

But CLF articulates more than mere concerns; it claims its members are directly exposed to pollutants by virtue of their proximity to the station.[6]  It is a "bedrock proposition" that "even an identifiable trifle" of an injury "is enough to confer standing." Katz, 672 F.3d at 76.  And, in this context, "likely exposure to pollutants is certainly something more than an identifiable trifle." Sierra Club v. Franklin Cnty. Power of Ill., LLC, 546 F.3d 918, 925-26 (7th Cir. 2008) (quoting LaFleur v. Whitman, 300 F.3d 256, 270-71 (2d Cir. 2002)); see also Hall v. Norton, 266 F.3d 969, 976 (9th Cir. 2001) ("[E]vidence of a credible threat to the plaintiff's physical well-being from airborne pollutants falls well within the range of injuries to cognizable interest that may confer standing."); Texans United for a Safe Econ. Fund v. Crown Cent. Petroleum Corp., 207 F.3d 789, 792 (5th Cir. 2000) ("[B]reathing and smelling polluted air is sufficient to demonstrate injury-in-fact and thus confer standing under the CAA").  Moreover, "where plaintiffs reside in

---

[6]To this end, CLF has also submitted an affidavit from Kenneth Colburn, an energy, emissions, and climate change consultant and former Director of the Air Resources Division of the New Hampshire Department of Environmental Services. Colburn's affidavit echoes and adds flesh to some of the allegations of the complaint.  He explains that MK2 is a major source of numerous pollutants, including $NO_x$ and $SO_2$, which adversely impact public health and the environment.  These pollutants, he says, also contribute to the creation of other pollutants, including ozone and particulate matter, which have further adverse impacts on public health and the environment.

close proximity to sources of air pollution, 'uncertainty' as to the health effects of such pollution constitutes cognizable injury-in-fact." Baur v. Veneman, 352 F.3d 625, 634 (2d Cir. 2003).

A more vexing question is whether this injury was caused by PSNH's allegedly unlawful activity--or, to use Laidlaw's terminology, is "fairly traceable" to that activity. 528 U.S. at 180. Unlike many environmental lawsuits that challenge the planned construction of a pollutant-emitting facility, this suit challenges changes to an existing facility that was already operating and emitting pollutants. In light of this idiosyncracy, the fact that CLF's members may be exposed to pollutants from Merrimack Station is, standing alone, not enough to confer standing: the real question is whether those members are exposed to different or greater amounts of pollutants than they would have been had the permitting process been observed.[7]

---

[7]The court pauses to note that although this order has repeatedly referred to exposure to pollutants as the "injury" CLF's members suffered, the real harm to those members (if any) may have been a denial of the opportunity to participate in the permitting process. Cf. Compl. ¶ 18 ("CLF members have been deprived of the opportunity to review and comment publicly on the full range of project impacts that will affect their interests"). A defendant's failure to engage in the process necessary to obtain a required permit, which would allow public scrutiny and comment, can satisfy the "actual injury" element of standing under certain circumstances. See, e.g., Nw. Envtl. Def. Ctr. v. Owens Corning Corp., 434 F. Supp. 2d 957, 964-65 (D. Or. 2006). However, "[a] mere inability to comment effectively or fully, in and of itself, does not establish an actual injury." AVX, 962

If not, any injury to CLF's members necessarily results from extant emissions, and cannot confer standing on CLF to bring the claims it asserts in this case.

CLF argues that the 2008 turbine project and the 2009 repairs to MK2 increase emissions of pollutants because they allow the facility to operate more frequently. CLF relies upon the affidavit of consultant Kenneth Traum, who attests that "the replacement of the steam turbine with one which creates more electricity and operates more cost effectively than that which it replaced"--which was the quintessence of the changes at issue in Counts 1 through 4--"will result in that unit being dispatched more often and operating more hours per year than it otherwise would have." And, if the unit operates more, CLF's reasoning goes, emissions will necessarily increase.[8] Cf. Compl. ¶¶ 58,

---

F.2d at 119. The plaintiff must still show that it suffered "a distinct and palpable injury" due to the defendant's actions. Id. Quite understandably, then, the parties' briefs have focused on injuries allegedly suffered from the plant's emissions, and this court's order follows suit.

Mindful of its duty to police the borders of its own jurisdiction, however, see Spielman v. Genzyme Corp., 251 F.3d 1, 4 (1st Cir. 2001), the court has independently satisfied itself that CLF has standing to enforce the procedural rights at issue here, as "the procedures in question are designed to protect [a] threatened concrete interest" of CLF's members, i.e., their interest in a pollution-free air, "that is the ultimate basis of [CLF's] standing." Lujan, 504 U.S. at 573 n.8; see also Ctr. for Food Safety v. Vilsack, 636 F.3d 116, 117 (9th Cir. 2011).

[8]Traum concedes that he is "not an expert in pollution controls at power plants," but opines that "it is apparent that if the facility operates more . . . , all other things being

63, 74 (alleging that emissions increases were projected as a result of MK2 turbine replacement and repairs).  In response, PSNH offers an evaluation of Merrimack Station by the New Hampshire Department of Environmental Services ("DES"), dated October 18, 2011, which reports that Merrimack Station has not, in fact, increased emissions since the 2008 and 2009 changes.  CLF argues, however, that the report is wrong because it is based on erroneous calculations.

The dispute about whether Merrimack Station's emissions increased (or are likely to increase) as a result of the 2008 and 2009 changes, and how to calculate those emissions, goes straight to the merits of CLF's claims in Counts 1 through 4.  With respect to existing sources of pollution, the permitting requirements at issue apply only to "modifications" or "major modifications," that is, those changes that result in emissions increases.  See 42 U.S.C. § 7411(a)(4); 40 C.F.R. § 52.21(b)(2); N.H. Code Admin R. Env-A 101.57 (1990).  Thus, if the 2008 and 2009 changes did not, or are not likely to, result in emissions increases, that would not only deprive plaintiffs of standing, it might well dispose of Counts 1 through 4 on their merits.

_____

equal, it will emit more air pollution . . . ."  At this stage of the case the court believes it reasonable to infer from the facts alleged that emissions did or are likely to increase as a result of the turbine replacement and related repairs.  See Katz, 672 F.3d at 70 (in considering Rule 12(b)(1) motion to dismiss, court should "indulge all reasonable inferences" in plaintiff's favor).

As the Court of Appeals has explained:

Where the jurisdictional issue and substantive claims
are so intertwined the resolution of the jurisdictional
question is dependent on factual issues going to the
merits, the district court should employ the standard
applicable to a motion for summary judgment.  Thus,
where the relevant facts are dispositive of both the
12(b)(1) motion and portions of the merits, the trial
court should grant the motion to dismiss only if the
material jurisdictional facts are not in dispute and
the moving party is entitled to prevail as a matter of
law.  If the plaintiff presents sufficient evidence to
create a genuine dispute of material (jurisdictional)
facts, then the case proceeds to trial, so that the
factfinder can determine the facts, and the
jurisdictional dispute will be reevaluated at that
point.

Torres-Negrón, 504 F.3d at 163 (internal quotations, citations,

and alterations omitted).  The "material jurisdictional facts"

here are very much in dispute.  This court accordingly has no

license at this stage of the case to decide one way or the other

whether the changes alleged in Counts 1 through 4 increased

Merrimack Station's emissions or are likely to do so in the

future.  Because there is a genuine dispute of material fact as

to that issue, those claims may proceed--for now.  The court will

revisit CLF's standing to bring Counts 1 through 4 once the facts

are more fully developed.


   B.   *Counts 5 and 6*

      In Counts 5 and 6, CLF alleges that PSNH violated the CAA

and the New Hampshire SIP by installing and operating the ACI

system without the required permits.  In moving to dismiss these

20

counts, PSNH once again argues that CLF has not alleged an injury
to its members that is traceable to the ACI system.  PSNH also
argues that because it had discontinued the ACI system before
this suit was filed, CLF cannot show a likelihood that its
members' injuries can be redressed by a favorable decision.  CLF
retorts that, again, its members were exposed to pollutants as a
result of PSNH's operation of the ACI system, and asserts that
this harm is redressable because there is a possibility that PSNH
could reinstate the ACI system.

The court need not analyze CLF's allegations of injury in
detail.  As already mentioned, see supra Part II, CLF alleges
that each operation of the ACI system resulted in increased
particulate emissions.  And, as just discussed, "likely exposure
to pollutants" is a sufficient injury to confer standing under
the CAA.  Franklin Cnty. Power, 546 F.3d at 925-26; Hall, 266
F.3d at 976; Crown Cent. Petroleum, 207 F.3d at 792.  The court
does agree, though, that its inability to redress this injury is
an impediment to CLF's standing to assert Counts 5 and 6.

To satisfy the redressability requirement of standing, a
plaintiff must show that "it is likely, as opposed to merely
speculative, that the injury will be redressed by a favorable
decision."  Laidlaw, 528 U.S. at 181.  "[T]he specific items of
relief sought" must "serve to reimburse [the plaintiff] for
losses caused by [the defendant's wrongful act], or to eliminate

21

any effects of that [act] upon [the plaintiff]." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 105-06 (1998).  The relief CLF seeks here will neither reimburse CLF (or its members) for PSNH's conduct, nor eliminate that conduct's ill effects.

Before turning to the type of relief CLF seeks, the court notes that the infractions alleged in Counts 5 and 6 are wholly past.  In support of its motion, PSNH has submitted the affidavit of its Director of Generation, William Smagula, who attests that PSNH decided in 2009 not to continue the ACI system, and removed or disconnected nearly all of the equipment used for the project. He further represents that PSNH has not used sorbent or activated carbon injection since 2009, and has no plans to resume using either the ACI system or that method.  CLF argues that this court cannot consider Smagula's affidavit in the context of a Rule 12(b) motion because it contradicts allegations that are central to the merits of CLF's claims.  See, e.g., Torres-Negrón, 504 F.3d at 163.  The court, though, perceives no contradiction between Smagula's affidavit, which attests to PSNH's present intentions (as well as its intentions and actions before and at the time this case was filed), and the cited portions of CLF's complaint, which allege only that at the time the ACI system was installed in 2009, PSNH intended to use it "on an ongoing basis." Compl. ¶ 86.  The complaint says nothing about PSNH's intentions or the state of affairs at the time CLF filed this case, and CLF

has not seriously contested Smagula's representations in any of its submissions in response to the motion to dismiss.

The relief CLF seeks must necessarily be examined in light of PSNH's decision to abandon the ACI system.[9]  The requested relief consists of civil penalties; a declaratory judgment that PSNH violated the CAA by failing to obtain preconstruction permits for the ACI system; an injunction against future violations; and injunctions requiring PSNH to apply for required permits, to implement BACT and/or LAER, to audit all generating stations for permit requirements, to take all necessary steps to comply with emission standards, and to take appropriate action to remedy impacts of CAA violations on human health and the environment.  The court addresses these in turn.

The Supreme Court has stated, in no uncertain terms, that statutory civil penalties imposed for past wrongs will usually not provide sufficient redress to meet the redressability

---

[9]CLF, citing Laidlaw, argues that the decision to abandon the ACI system "could never moot CLF's claims or be dispositive of CLF members' standing."  Memo. in Opp. (document no. 20-1) at 19 n.16.  It is true that the defendant's "voluntary cessation of a challenged practice" does not render a case moot unless the party asserting mootness carries the "formidable burden" of demonstrating "that the challenged conduct cannot reasonably be expected to start up again."  Laidlaw, 528 U.S. at 189-90.  But, as the Laidlaw Court recognized, the burden of establishing standing lies with the plaintiff, and "there are circumstances in which the prospect that a defendant will engage in (or resume) harmful conduct may be too speculative to support standing, but not too speculative to overcome mootness."  Id. at 190.

requirement.  Steel Co., 523 U.S. at 106-07.[10]  Civil penalties
"might be viewed as a sort of compensation or redress to [the
plaintiff] if they were payable to [the plaintiff]."  Id. at 106.
But where, as here, civil penalties are payable to the United
States Treasury, see 42 U.S.C. § 7604(g)(1), they can only serve
an "undifferentiated public interest" in "seeing [the defendant]
punished for its infractions."  Steel Co., 523 U.S. at 106-07.
"[A]lthough a suitor may derive great comfort and joy from the
fact that the United States Treasury is not cheated, that a
wrongdoer gets his just deserts, or that the Nation's laws are
faithfully enforced, that psychic satisfaction is not an
acceptable Article III remedy because it does not redress a
cognizable Article III injury."  Id. at 107.  Similarly, a
declaratory judgment that PSNH has violated the CAA would have
little actual benefit to CLF or its members; at most, it would
appear to provide the same "psychic satisfaction" as civil
penalties.  See id. at 106 (declaratory judgment that defendant

---

    [10]In Laidlaw, the Supreme Court clarified that, "[t]o the
extent that they encourage defendants to discontinue current
violations and deter them from committing future ones," civil
penalties "afford redress to citizen plaintiffs who are injured
or threatened with injury as a consequence of ongoing unlawful
conduct." 528 U.S. at 186 (emphasis added). But where, as here,
the defendant's violation is not ongoing, Steel Co. is
controlling. See, e.g., WildEarth Guardians v. Pub. Serv. of
Colo., — F.3d —, 2012 WL 3243458, *6-8 (10th Cir. Aug. 10, 2012).

had violated statute in the past "is not only worthless to [plaintiff], it is seemingly worthless to all the world").

CLF's requests for equitable relief fare no better. "[P]ast exposure to harm will not, in and of itself, confer standing upon a litigant to obtain equitable relief 'absent a sufficient likelihood that he will again be wronged in a similar way.'" Am. Postal Workers Union v. Frank, 968 F.2d 1373, 1376 (1st Cir. 1992) (quoting Los Angeles v. Lyons, 461 U.S. 95, 111 (1983)); see also Lujan, 504 U.S. at 564 ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects."). Thus, to obtain such relief, the plaintiff must allege "a continuing violation or the imminence of a future violation." Steel Co., 523 U.S. at 108-09.

CLF gamely asserts that, given the past violations of permitting requirements alleged in the complaint, it is possible (or perhaps even probable) that PSNH will violate permitting requirements in the future. But a future violation must not only be possible, but imminent, for injunctive relief to satisfy the redressability requirement. See id.; cf. Laidlaw, 528 U.S. at 180 (injury must be "actual or imminent, not conjectural or hypothetical" to satisfy requirements of standing). A mere possibility that PSNH will again forego the permitting process when, at some indeterminate point in the future, it undertakes to

25

modify its facility in some other unspecified way, does not establish that a future violation is imminent. See Berry v. Farmland Indus., Inc., 114 F. Supp. 2d 1150, 1155 (D. Kan. 2000) ("[A] past pattern of intermittent violations . . . would not allow a reasonable fact finder to find that future violations were imminent when the complaint was filed." (emphasis in original)). The cases upon which CLF relies are not to the contrary. Each of those cases involved an alleged violation that was continuing to take place at the time of the suit. See Parker v. Scrap Metal Processors, 386 F.3d 993, 1002 (11th Cir. 2004); Ass'n of Irritated Residents v. C & R Vanderham Dairy, No. 05-cv-1593, 2007 WL 2815038, *7-*10 (E.D. Ca. Sept. 25, 2007); Anderson v. Farmland Indus., Inc., 70 F. Supp. 2d 1218, 1221-22, 1229-30 (D. Kan. 1999). None of them supports the proposition that wholly past violations demonstrate a likelihood of imminent future violations that can be addressed by injunctive relief.

CLF also argues that PSNH might decide to use either the ACI system, or the activated carbon injection method, to reduce mercury emissions in the future. It notes that Smagula, in his affidavit, admits that PSNH has not yet removed all equipment from the ACI system. It also cites a paragraph in a March 9, 2009 decision of the New Hampshire DES pertaining to the issuance of a temporary permit to PSNH for the installation of a flue gas desulfurization system to reduce mercury and $SO_2$ emissions at

26

Merrimack Station.  See Compl. Ex. 4 (document no. 1-6) at 23.
The desulfurization system, or "scrubber," appears to be the
means for reducing mercury emissions that PSNH selected to
replace the ACI system.  In response to a public comment that a
scrubber could remove mercury more efficiently by using activated
carbon injection technology, the DES stated that use of a
scrubber and use of activated carbon injunction were not mutually
exclusive, and that an activated carbon injection could be used
to supplement the scrubber (cost permitting).  Id.  These
remarks, and the fact that some ACI equipment remains at
Merrimack station, do suggest a possibility that PSNH may use ACI
technology in the future.  Again, though, mere possibility is not
enough:  "a continuing violation or the imminence of a future
violation" is necessary to confer Article III standing to seek
injunctive relief.  Steel Co., 523 U.S. at 108-09.[11]

_____

[11]CLF does seek an injunction "to remedy, mitigate, and
offset the impacts of [PSNH's] violations of the CAA and the N.H.
SIP on human health and the environment."  (This appears to be a
vaguely-phrased request that the court order PSNH to use some of
the civil penalties mentioned above for "beneficial mitigation
projects" that "enhance the public health or the environment."
See 42 U.S.C. § 7604(g)(2).)  This request differs from typical
injunctive relief insofar as it is remedial in nature, rather
than prospective, and a different standard might arguably apply
to it.  Even so, CLF has not established redressability, because
this relief is not focused on CLF members' alleged injuries, but
seeks to benefit the public at large and the environment as a
whole.  "A project that generally enhances the public health or
environment is no more redress for plaintiffs' particular claims
than a fine that generally encourages compliance with the Act and
benefits the undifferentiated public interest."  Cambrians for

CLF has not demonstrated a sufficient likelihood that a favorable decision will redress the injury suffered as a result of the wrongful conduct alleged in Counts 5 and 6.  CLF accordingly lacks standing to bring those counts.  They are dismissed.

### C.   *Count 7*

In Count 7, CLF alleges that in 2008 and 2009, PSNH failed to operate the ESPs on MK1 and MK2 in accordance with its temporary permits for them.  Specifically, CLF alleges that the permits required PSNH to operate the ESPs at all times when the units generated power above prescribed minimums, and that some sections of the ESPs were not operating when the station was

---

Thoughtful Dev., U.A. v. Didion Milling, Inc., 571 F. Supp. 2d 972, 981 (W.D. Wis. 2008) (citing Steel Co., 523 U.S. at 106); see also WildEarth, 2012 WL 3243458, at *10-12 (similar).

As a further aside, the court acknowledges that CLF has contended (albeit not in the most comprehensible manner) that if PSNH had applied for permits for any of the projects alleged in Counts 1 through 6, the New Hampshire DES would have required PSNH to adopt the BACT and LAER standards at Merrimack Station. At oral argument, CLF repeated this contention, and suggested that by ordering PSNH to undertake the permitting process retroactively, this court could "redress" its members' injuries from PSNH's ongoing failure to observe those standards.  But where redressability "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or predict," such as the DES, "it becomes the burden of the plaintiff to adduce facts showing that those choices have been or will be made in such manner as to produce causation and redressability of injury." Lujan, 504 U.S. at 562 (internal quotations omitted).  CLF has not carried that burden.

generating power in excess of those limits.  It further alleges

that PSNH did not comply with the permits' recordkeeping and

reporting requirements.  PSNH again argues that CLF has not

alleged any injury traceable to the ESPs' inoperation.  In

addition, PSNH contends that any injury is not redressable

because its alleged violations occurred in the past and the

temporary permits are no longer in effect, having been replaced

by a Title V Operating Permit[12] with different requirements for

operation of the ESPs.

The court agrees that CLF has not identified any injury its

members suffered when sections of the ESPs did not operate.  CLF

alleges that ESPs are "pollution control devices operated by PSNH

to reduce particulate matter emissions."[13]  Compl. ¶ 82.  But it

provides no explanation of how, or to what extent, occasionally

non-functioning sections of such ESPs affect air quality.  Nor

does CLF allege that Merrimack Station emitted any additional

---

[12]Title V of the CAA requires every "major source" of air
pollution to obtain an operating permit that contains emission
limitations and other conditions to ensure compliance with air
quality control standards.  42 U.S.C. § 7661a; see generally
Operating Permit Program, 57 Fed. Reg. 32,250 (July 21, 1992)
(later codified at 40 C.F.R. § 70.1 et seq.).

[13]PSNH provides a more complete description in its motion to
dismiss, explaining that ESPs reduce particulate matter emissions
by attracting electrically charged particles to collection plates
with an opposite charge.  See also supra n.3.  According to PSNH,
MK1 and MK2 were built with ESPs and supplemental precipitators
were added later; together, these precipitators result in 99%
efficiency of particulate removal.  CLF does not dispute this.

particulate matter or pollutants when the ESPs were inoperative.
It simply alleges, generally, that Merrimack Station emits
pollutants.  But CLF members' exposure to pollutants is, of
course, not sufficient to confer standing unless that exposure is
"fairly traceable" to PSNH's conduct.  Laidlaw, 528 U.S. at 180.

     Moreover, even if CLF had sufficiently shown some injury to
its members as a result of PSNH's alleged permit violations, it
has not shown that this court can redress that injury.  CLF does
not dispute that PSNH's alleged violations of the temporary
permits took place over two years before this action was filed,
with the last alleged violation in May 2009.  As with Counts 5
and 6, the only relief CLF seeks for these past violations
consists of civil penalties, a declaratory judgment, and various
injunctive relief.  But, as discussed in the foregoing section,
none of these forms of relief can serve to redress whatever past
injuries CLF's members suffered, in the absence of a continuing
violation or an imminent future violation.  CLF again argues that
PSNH's past violations of the temporary permits' requirements
create a substantial risk that PSNH will repeat the violations in
the future, but, as already discussed, a mere possibility of
future violations based on nothing more than a pattern of past
violations is insufficient to render a plaintiff's injury
redressable for purposes of Article III standing.  Because CLF
lacks standing to pursue Count 7, that count is dismissed.

IV.  **Conclusion**

For the reasons set forth above, PSNH's motion to dismiss for lack of standing[14] is GRANTED as to Counts 5 through 7 and DENIED as to Counts 1 through 4.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  September 27, 2012

cc:  Christophe G. Courchesne, Esq.
     N. Jonathan Peress, Esq.
     Michael D. Freeman, Esq.
     Spencer M. Taylor, Esq.
     Barry Needleman, Esq.
     Jarrett B. Duncan, Esq.
     Linda T. Landis, Esq.
     Wilbur A. Glahn, III, Esq.
     Thomas A. Benson, Esq.
     Elias L. Quinn, Esq.
     George P. Sibley, Esq.
     Makram B. Jaber, Esq.
     Stephen H. Roberts. Esq.

---

[14]Document no. 14.

31